# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **NICKOLAS KONOLOFF, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-cv-00338-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Carolyn Colvin,* | ) | |
| *Acting Commissioner of SSA*, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Nickolas Konoloff, Jr., appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Konoloff applied for DIB and SSI on or about July 2009, alleging disability as of September 2008. (DE 12 Administrative Record ("AR") 314-23, 474). His DIB-insured status expired on June 30, 2013 (AR 21, 90, 367), so with respect to his DIB application, he must show that he was disabled on or before that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). The Commissioner denied Konoloff's application initially and upon reconsideration.

---

[1] All parties have consented to the Magistrate Judge. (DE 15); *see* 28 U.S.C. § 636(c).

(AR 146, 178-210). After a hearing (AR 46-86), Administrative Law Judge Bryan J. Bernstein issued Konoloff an unfavorable decision, concluding that he was not disabled (AR 146-59). On January 30, 2013, the Appeals Council vacated that decision and remanded the case to consider new evidence and to reconsider the opinion of Dr. Berube and the assigned residual functional capacity ("RFC"). (AR 172-75, 260-61, 274, 474-81).

A second hearing was held on July 30, 2013, before Administrative Law Judge Terry Miller ("the ALJ"), at which Konoloff, who was represented by counsel, and vocational expert Robert Steven Barkhaus ("the VE") testified. (AR 87-138). On November 13, 2013, a new unfavorable decision was issued to Konoloff, finding that he was not disabled because despite the limitations caused by his impairments, he could perform a significant number of unskilled, light work jobs in the economy, including electrical accessories assembler, small products assembler, and laundry folder. (AR 21-35). This time the Appeals Council denied Konoloff's request for review (AR 1-4), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Konoloff filed a complaint with this Court on October 24, 2014, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Konoloff argues that the ALJ: (1) erred by omitting limitations in the assigned RFC for his nebulizer treatments three to four times a day and his daily headaches; (2) improperly discounted the opinions of his treating physicians, Dr. Gary Berube and Dr. Joel Valcarcel; and (3) assigned a mental RFC that is not supported by substantial evidence. (DE 22 at 11-21).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Konoloff was 48 years old (AR 357), had a high school education (AR 407), and had past work experience as a construction and factory laborer (DE 393). He alleges disability due to pulmonary insufficiency, headaches, low back pain, depression, anxiety, and hepatitis C. (DE 22 at 2).

### A. Konoloff's Testimony at the Hearing

At the hearing on July 30, 2013, Konoloff testified that he lives alone in a mobile home on a farm owned by his family, who live next door. (AR 95-96, 117, 119). He is independent with his self care and basic household tasks. (AR 123-24). His typical day involves visiting at his sister's home in the morning, talking with his nephew on the farm in the afternoon, taking his medications, fixing a light meal, reading, and watching television. (AR 119-21). He naps for 45 minutes, three to four times a week. (AR 126). Each week, he leads three Alcoholics Anonymous meetings, two online and one in person, and he also attends church. (AR 121, 125).

Konoloff testified that his headaches, which occur daily, are his most limiting condition, describing the pain as "somebody putting a knife into your skull." (AR 99, 127-28). When he has a "full-blown" headache, he cannot do anything (AR 127); however, he takes Percocet and Fioricet, which help reduce the severity of his headaches and prevent them from becoming "full-blown." (AR 99-100, 127). He assessed his headache pain when taking medications as a four on a scale of one to 10. (AR 102). Konoloff also complained of low back pain due to two herniated discs; he rated this pain as a four, stating that it is centralized in his right lower back and does not travel down his legs. (AR 100-01, 128). Additionally, Konoloff reported neck pain, which he

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 1,353-page administrative record necessary to the decision.

rated as a four or five without medication and a two with medication; his neck pain sometimes causes his arms to feel numb or tingling. (AR 102-03, 129). He also experiences atrial fibrillation when he overexerts himself; these episodes last up to 15 minutes, and he takes medication for the condition. (AR 104-05, 128-29).

Konoloff testified that he has breathing difficulties due to asthma and chronic obstructive pulmonary disorder ("COPD"); for this condition he takes nebulizer treatments at home three to four times a day. (AR 106). He administers his first nebulizer treatment between 8:00 and 9:00 a.m., his second treatment around noon, and his third treatment around 3:00 to 4:00 p.m. (AR 120). His first nebulizer treatment of the day, together with his other medications, "make[s] [him] feel sluggish" and not "on top of the game." (AR 120-21).

Konoloff estimated that he could walk up to 25 feet before needing to rest and catch his breath, and he indicated that he could stand for 20 minutes before needing to sit down. (AR 108-09). He stated that he could sit for an hour before needing to stand and stretch. (AR 109-10). He estimated he could lift 20 pounds, but not frequently. (AR 110). Sometimes he drops items due to numbness and tingling in his hands. (AR 110).

Konoloff further testified that he takes various medications for his anxiety and bipolar disorder and that he had been participating in mental health counseling since 2009. (AR 111-13). He complained of a depressed mood, decreased attention and concentration, poor memory, and sporadic sleep. (AR 114-15, 117, 126). He stated that he does not like to be around other people, but he is able to go to the store and maintain a relationship with his family. (AR 115-16, 118).

*B. Summary of the Relevant Medical Evidence*

From March 2009 to July 2013, Konoloff was treated by Dr. Thomas Kintanar, Dr. Joel Valcarcel, and nurse practitioner Lisa Foldesi of Churubusco Family Medicine for various conditions, including a cough, depression, anxiety, back pain, and headaches. (AR 557-59, 637-59, 771, 780-813, 1092-1121, 1158-63). He was prescribed Percocet, Albuterol, Ativan, Naproxyn, Topamax, Neurontin, and other medications. (AR 557-59, 637-59, 771, 780-13, 1092-121, 1158-63). The Albuterol was administered via nebulizer treatments up to every six hours, in addition to inhalers. (AR 557-58, 643, 646, 648, 651, 655, 813, 1095-96, 1103, 1108-09, 1113).

On July 23, 2009, Dr. Valcarcel completed a multiple impairment questionnaire form, listing clinical findings of morbid obesity and wheezes, and symptoms of constant low back pain, anxiety, congestive heart failure, and headaches. (AR 581-88). He found that Konoloff had moderately severe pain and moderate fatigue. (AR 583). Dr. Valcarcel opined that in an eight-hour workday, Konoloff could stand or walk for one hour, sit for two hours, and must get up and move around for one hour after sitting for an hour; he could lift up to 10 pounds frequently and 20 pounds occasionally and could carry five pounds frequently and 10 pounds occasionally. (AR 583-84). Dr. Valcarcel wrote that Konoloff had moderate limitations in reaching, grasping, and performing fine manipulations with his upper extremities (AR 584-85); he must also avoid environmental hazards, such as fumes, gases, humidity, and dust (AR 587). Dr. Valcarcel opined that Konoloff's symptoms were severe enough to periodically interfere with his attention and concentration, that his symptoms would likely increase in a competitive work situation, and that his anxiety and major depressive disorder rendered him capable of only

"low-stress" work tasks. (AR 586). Dr. Valcarcel further indicated that Konoloff would need to take unscheduled 10-minute breaks every 20 minutes and that he would miss more than three days of work a month. (AR 587).

In August 2009, Konoloff was evaluated by Dr. Barbara Eichman, a psychiatrist at the Bowen Center. (AR 592-96). He was 98-days sober and was attending an Alcoholics Anonymous meeting every day. (AR 592-93). Dr. Eichmann noted that Konoloff's stream of thought was logical and sequential; he was having a lot of anxiety-based sleep problems, but he was not suicidal. (AR 594). His judgment and insight were fair, and his intellect and concentration were average. (AR 595). Dr. Eichmann diagnosed a depressive disorder, not otherwise specified; alcohol dependence, in recent remission; methamphetamine dependence, in sustained remission; and cannabis abuse, in remission. (AR 595). She assigned him a Global Assessment of Functioning ("GAF") score of 75 and prescribed Cymbalta and Klonopin.[3] (AR 596).

Three months later, in November 2009, Dr. Umamaheswara Kalapatapu of the Bowen Center added a diagnosis of bipolar I disorder, most recent episode mixed. (AR 747). Konoloff continued to receive medication management and twice-monthly counseling at the Bowen Center

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.* And a GAF score of 71 to 80 reflects transient symptoms as expectable reactions to psychosocial stressors or a slight impairment in social, occupational, or school functioning. *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Konoloff, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

through August 2013.  (AR 661, 741-42, 756-71, 837-58, 942-1000, 1305-53).

Also in November 2009, Revathi Bingi, Ed.D., a licensed psychologist, evaluated Konoloff at the request of Social Security.  (AR 675-78).  Konoloff had no energy and was easily breathless; his mood was sad, and his affect varied.  (AR 675).  He reported disturbed sleep, nightmares, anger, mood swings, racing thoughts, and excessive anxiety.  (AR 675).  He was, however, able to focus well on the task at hand.  (AR 675).  Konoloff's memory, judgment, and insight were good; he was cooperative with the examiner and denied experiencing any hallucinations or delusions.  (AR 677).  Dr. Bingi assigned Konoloff a GAF of 53 and diagnoses of major depression, recurrent, moderate without psychotic features; anxiety disorder, not otherwise specified; and alcohol abuse, in remission.  (AR 678).

In December 2009, Ann Lovko, Ph.D., a state agency psychologist, reviewed Konoloff's record and completed a psychiatric review technique form, concluding that his mental impairments were non-severe.  (AR 693-706).  Specifically, she opined that Konoloff had mild restrictions in activities of daily living and in maintaining concentration, persistence, or pace, and no difficulties in maintaining social functioning.  (AR 703).  Dr. Lovko's opinion was later affirmed by another state agency psychologist.  (AR 753).

That same month, Konoloff was examined by Dr. H.M. Bacchus, Jr., at the request of Social Security.  (AR 679-81).  Konoloff told Dr. Bacchus that he could sit indefinitely, stand for 30 minutes, walk 10 minutes, lift 10 pounds, and perform his daily activities slowly with frequent breaks.  (AR 679).  He avoids unfamiliar places and social situations; he has suicidal thoughts, but no plan.  (AR 679).  He uses nebulizer treatments and an inhaler.  (AR 679).  Upon examination, Konoloff was mildly short of breath with exertion, and he moved somewhat slowly

from the exam table to the chair. (AR 680). He had tenderness to palpation of the lumbosacral spine, but normal range of motion, strength, and gait; he was able to walk on heels, tandem walk, and squat, but did not walk on toes or hop due to back pain. (AR 680). His fine and gross dexterity was preserved, and his sensation was intact. (AR 680). Dr. Bacchus diagnosed hepatitis C, treated; history of idiopathic cardiomyopathy, currently stable; history of atrial fibrillation, currently stable; hypertension, fair control; depression and anxiety, treated; history of COPD, treated; frequent headaches; hyperlipidemia, treated with medication; and history of tobacco and alcohol abuse, currently in recovery. (AR 681).

Also in December 2009, Konoloff underwent pulmonary function testing with Dr. Kintanar. (AR 786-87). His pre- and post-bronchodilator FEV1 scores were 4.98 and 5.93, respectively; his DLCO value was 23.18, which was 66% of predicted. (AR 786). He was diagnosed with mild obstructive lung disease with borderline bronchodilator response, early small airways disease, and mild decrease in diffusion capacity. (AR 786). In January 2010, Konoloff underwent pulmonary function testing at the request of Social Security. (AR 708). His pre- and post-bronchodilator FEV1 scores were 2.17 (51%) and 2.49 (58%), respectively. (AR 708).

In January 2010, Dr. Mangala Hasanadka, a state agency physician, reviewed Konoloff's record and concluded that he could lift 25 pounds frequently and 50 pounds occasionally, stand or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and must avoid concentrated exposure to certain environmental factors. (AR 718-25). Dr. Hasanadka's opinion was later affirmed by a second state agency physician. (AR 754).

From April 2010 through April 2011, Dr. Daniel Roth provided pain management

services to Konoloff for his headaches and neck pain. (AR 870-72, 880-904). Dr. Roth documented that Konoloff's migraine pain ranged from a seven to a 10 and his neck pain from a five to a 10. (AR 870-72, 880-904). In October 2010, Dr. Roth penned a letter, stating that Konoloff had chronic headaches combined with weakness, numbness, and tingling in his upper extremities and that a July 2010 EMG revealed a chronic, mild cervical radiculopathy. (AR 835). Dr. Roth's impression was cervical radiculopathy, chronic headaches, chronic pain syndrome, and cervical facet arthropathy, bilateral; Dr. Roth indicated that he had prescribed Doxepin and Percocet and administered several cervical facet injections. (AR 835; *see* AR 898).

In October 2010, Debra Musser, a pre-doctoral intern at the Bowen Center, wrote a letter stating that she had been counseling Konoloff since August 2009. (AR 837). She indicated that he had a good prognosis, provided that he continue with regular attendance and psychiatric medication management. (AR 837). Ms. Musser further stated that although Konoloff could sustain a task for a short period of time, he reported an inability to sustain a task over an eight-hour workday or work week because his physical health conditions interfere with his full-time work pace. (AR 837). Ms. Musser wrote that Konoloff demonstrated an increased ability to tolerate low to moderate stress over a short amount of time, but that she could not speak to his ability to tolerate higher amounts of stress in a work environment. (AR 837).

Also in October 2010, Dr. Hani Ahmad, a psychiatrist at the Bowen Center, wrote a letter, indicating that Konoloff had been diagnosed with major depressive disorder, recurrent, moderate, without psychotic features; and alcohol dependence, in full sustained remission. (AR 839). Dr. Ahmad stated that Konoloff struggled with alcohol for many years as a way to self-medicate his depression. (AR 839). He was responding to a combination of Lexapro, Prozac,

and Abilify and had "finally started making progress with his depression and seems to be coming out of his depression." (AR 839). Dr. Ahmad indicated that Konoloff had a fair prognosis but still needed intensive medication management. (AR 839).

In March 2011, Dr. Roth reviewed Konoloff's recent brain MRI, which noted minimal small vessel disease. (AR 889; *see* AR 937-38). In April 2011, Konoloff reported to Dr. Roth that his current medications were effective in treating some of his symptoms. (AR 880-81). Konoloff rated his shoulder and arm pain as a nine, stating that it increases to 10 at times; his headaches, when severe, are an eight. (AR 881-82). His pain worsens as the day progresses. (AR 881). Dr. Roth scheduled Konoloff for an occipital nerve stimulator trial. (AR 882).

Dr. Gary Berube treated Konoloff for pain and general medical conditions from March 2010 through July 2013. (AR 831, 874, 906-12, 1064-90, 1130-57, 1175-86, 1191). In September 2010, Dr. Berube wrote a letter stating that Konoloff had been under his care since March 2010, that Konoloff's longstanding COPD "requires the use of a nebulizer machine on a regular basis," and that Konoloff was "medically incapable of gainful employment." (AR 831).

In January 2011, Dr. Berube completed a multiple impairment questionnaire form, reflecting diagnoses of cervical disc disease, cervical facet joint syndrome, cervical radiculopathy, lumbar disc disease, affective disorder, arteriosclerotic heart disease, COPD, and hypertension. (AR 860-68). Dr. Berube identified symptoms of decreased cervical and lumbar range of motion and radicular pain in both upper extremities; he indicated that Konoloff's pain and fatigue were both moderately severe. (AR 861-62). He estimated that in an eight-hour workday, Konoloff could sit less than an hour, stand less than an hour, and must move around for 20 minutes every 20 minutes; he could lift or carry 10 pounds occasionally. (AR 862-63).

Dr. Berube further wrote that Konoloff had marked limitations in reaching, grasping, and performing fine manipulations with his upper extremities. (AR 863-64). Konoloff also needed to avoid certain environmental hazards. (AR 867). Additionally, Dr. Berube opined that Konoloff's symptoms were severe enough to constantly interfere with his attention and concentration, and that Konoloff's bipolar and affective disorders render him incapable of even "low stress" work tasks. (AR 865). Dr. Berube indicated that Konoloff would need to take unscheduled breaks every 15 minutes and would miss more than three days of work a month. (AR 867).

In February 2011, Konoloff went to the emergency room for headache pain. (AR 875). He had run out of his medications. (AR 875).

In March 2011, Konoloff asked Dr. Berube for a referral to a different pain management physician, complaining that Dr. Roth, his current pain management physician, was just renewing his medications without further investigating the cause of his pain. (AR 909). Two months later, Konoloff reported to Dr. Berube that his new pain management physician had prescribed methadone, which caused excessive sedation and did not control his headaches. (AR 906). Dr. Berube prescribed Fioricet instead. (AR 906).

In September 2011, Dr. Berube completed a headaches impairment questionnaire form, stating that Konoloff had chronic right fronto-occipital headaches up to twice a week that were steady, aching, and caused level-10 pain. (AR 929-34). Dr. Berube wrote that Konoloff's headaches were severely intense; caused visual disturbances, mood changes, and concentration problems; occurred daily; and lasted two to three hours. (AR 930). Dr. Berube further indicated that when Konoloff had a headache, he could not perform even basic work tasks and would need

a break from the workplace; he estimated that Konoloff would miss more than three days of work a month due to headaches. (AR 933).

In January 2012, Konoloff went to the emergency room for a break-through headache that his medications, including morphine, could not handle. (AR 1025). He was administered intravenous pain and nausea medications. (AR 1027-28).

In February 2012, a cervical MRI revealed degenerative disc disease from C2 through C7 with a disc protrusion at C5-6 and bulges at C2-3 and C6-7. (AR 940). In May 2012, Dr. Berube documented that Konoloff had discontinued his care with Dr. Roth a year earlier due to "high associated costs" and his failure to improve. (AR 1179). Dr. Berube increased Konoloff's Percocet from four times a day to six times a day. (AR 1175).

From June 2012 through June 2013, Konoloff received pain management services from Dr. Ajit Pai. (AR 1275-1304). Konoloff's pain ranged from a five to a nine, but usually was at a seven when treated with Oxycodone, Fioricet, Indocin, and Percocet. (AR 1275-1304).

In May 2013, Konoloff told Dr. Berube that Percocet was not sufficiently controlling his headaches and low back pain. (AR 1074). Dr. Berube adjusted Konoloff's medications. (AR 1074). In June 2013, Konoloff underwent a biopsy due to exacerbation of his headaches; the biopsy was normal; Dr. Berube later ordered a brain CT scan. (AR 1065, 1200, 1203).

In June 2013, Konoloff went to the emergency room for severe, right temporal headache. (AR 1204-09). He was also having atrial fibrillation, chest pain, a cough, numbness in his legs, and shortness of breath (AR 1204); the pain was so severe that he was contemplating suicide (AR 1206). He was hospitalized for four days. (AR 1208).

In July 2013, Konoloff was evaluated by Dr. Santosh Maharjan, a psychiatrist. (AR

1305-10).  Konoloff's stream of thought was coherent, logical, and goal-directed; he had a down mood.  (AR 1307).  His judgment and insight were fair, and his intellect and concentration were poor.  (AR 1308).  Dr. Maharjan assigned Konoloff a current GAF of 55 and diagnoses of a major depressive disorder, recurrent; alcohol dependency in full remission; and nicotine dependence.  (AR 1309).

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits."  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

# IV. ANALYSIS

## A. The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On November 13, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 21-35). The ALJ observed at step one of the five-step analysis that Konoloff had not engaged in substantial gainful activity since his alleged onset date of September 1, 2008. (AR 23). At step two, the ALJ found that Konoloff had the following severe impairments: history of COPD/sleep apnea, history of hepatitis C requiring treatment, obesity, history of headaches and cervical facet arthropathy/cervical disc disease and lumbar disc disease, and moderate major depression without psychotic features/bipolar disorder and anxiety disorder. (AR 23).

At step three, the ALJ concluded that Konoloff did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 25-28). Before proceeding to step four, the ALJ determined that Konoloff's symptom testimony was "not entirely credible" and assigned him the following RFC:

> [T]he claimant has the [RFC] to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. In an eight-hour period, he is able to sit for a total of 6 hours and stand/walk a total of 4 hours. In addition, he needs a sit/stand option (which allows for alternating between sitting and standing up to every 30 minutes if needed, but the positional changes will not render the claimant off task). He cannot climb ladders, ropes, or scaffolds at all and he can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He must avoid concentrated exposure to extreme cold and heat, humidity, and pulmonary irritants (such as fumes, odors, dust, gases, chemicals, and poorly ventilated areas). Mentally, the claimant cannot understand, remember, or carry out detailed or complex job instructions but can perform simple, repetitive tasks on a sustained basis (meaning 8 hours per day/5 days per week or an equivalent work schedule). He must have work at a flexible pace (where the employee is allowed some independence in determining either the timing of different work activities or

15

the pace of work). He cannot be exposed to intense or critical supervision.

(AR 29).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Konoloff was unable to perform any of his past relevant work. (AR 34). At step five, however, the ALJ found that Konoloff could perform a significant number of other unskilled, light-work jobs in the economy, including electrical accessories assembler, small products assembler, and laundry folder. (AR 35). Therefore, Konoloff's applications for DIB and SSI were denied. (AR 35).

### C. The RFC Will Be Remanded for Consideration of Konoloff's Nebulizer Use

Konoloff argues that the RFC assigned by the ALJ failed to account for his nebulizer treatments three to four times a day. Because the evidence of Konoloff's nebulizer use three to four times a day is uncontradicted, Konoloff's challenge to the assigned RFC is persuasive.

The RFC is a determination of the tasks a claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1545(e), 416.945(e); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). The RFC assessment:

> is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5; see 20 C.F.R. §§ 404.1545, 416.945. When crafting the RFC and step-five hypotheticals, an ALJ must include "all limitations supported by medical evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) (citing *Steele v.*

16

*Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)); *see also Jens*, 347 F.3d at 213.

Here, the medical evidence and Konoloff's testimony reveal that Konoloff used a nebulizer three to four times a day to control his asthma and COPD. (AR 120-21, 569, 831, 908, 936, 1047, 1095, 1130, 1156, 1217, 1242, 1260, 1264). The ALJ acknowledged that Konoloff's COPD was a severe impairment and that he used a nebulizer three to four times a day. (AR 23, 29). The ALJ, however, did not include Konoloff's regular nebulizer treatments in the RFC or in the series of hypotheticals posed to the VE at step five. Instead, the ALJ restricted Konoloff from "concentrated exposure to extreme cold and heat, humidity, and pulmonary irritants (such as fumes, odors, dust, gases, chemicals, and poorly ventilated areas)." (AR 29).

Konoloff argues that the ALJ erred by failing to include a limitation in the RFC and the hypotheticals for the nebulizer treatments that he takes three to four times a day. Konoloff testified that he takes his first nebulizer treatment between 8:00 and 9:00 a.m., his second nebulizer treatment around noon, and his third around 3:00 or 4:00 p.m.; presumably, he takes his fourth treatment in the evening. (AR 119-20). Konoloff did not state how long each nebulizer treatment took to administer,[5] but he did say that his first treatment of the day, together with his other medications, "make[s] [him] feel sluggish" and not "on top of the game." (AR 120-21). The ALJ did not ask Konoloff at the hearing how long it took to administer a nebulizer treatment or whether the device was portable such that treatments could be performed away from home.

---

[5] In other cases involving nebulizer treatments, claimants typically state that each treatment takes from 15 to 30 minutes and causes some after effects. *See, e.g., Klitz v. Barnhart*, 180 F. App'x 808, 809 (10th Cir. 2006) (each nebulizer treatment took 15 to 25 minutes); *Smith v. Astrue*, No. 1:10-CV-163-TLS, 2011 WL 3922465, at *2 (N.D. Ind. Sept. 7, 2011) (each nebulizer treatment took 15 minutes and caused 15 minutes of after effects); *Begolke v. Astrue*, No. 06-C-445-C, 2007 WL 5555951, at *10 (W.D. Wis. June 7, 2007) (each nebulizer treatment took 15 minutes); *Carroll v. Barnhart*, 291 F. Supp. 2d 783, 789 (N.D. Ill. 2003) (each single nebulizer treatment took 15 minutes and each double nebulizer treatment took 30 minutes).

At the hearing, the ALJ posed to the VE a series of hypothetical questions with increasingly debilitating limitations, circumscribing the exact limitations the VE was to follow. (AR 131-38). As such, the VE was prohibited from considering any other limitations "that he may have absorbed either through reviewing the evidence in the record or by listening to the hearing testimony." *Young*, 362 F.3d at 1003. These hypotheticals, however, did not include the use of a nebulizer three to four times a day, and therefore, the VE did not consider this limitation. (AR 132-36); *cf. Carroll*, 291 F. Supp. 2d at 794-95 (finding that the ALJ adequately accounted for claimant's mild pulmonary obstruction where the VE specifically testified that the claimant's limitations and regular use of a nebulizer would have little effect on the claimant's occupational base).

Nevertheless, the Commissioner argues that the RFC and hypotheticals crafted by the ALJ adequately account for Konoloff's asthma and COPD. The Commissioner emphasizes that the ALJ considered Konoloff's lung capacity readings from November 2009 and January 2010, noted that he "refused CPAP treatment," and observed that he had not "sought or required regular or frequent emergency room visits, inpatient hospitalizations, or physician-intervention for acute exacerbations." (DE 24 at 17-18 (quoting AR 33)). From these statements by the ALJ, the Commissioner infers that, because the ALJ found Konoloff not fully credible on other grounds, the ALJ must have chosen not to fully credit Konoloff's testimony about the extent of his nebulizer use. The Commissioner then urges that the ALJ reasonably determined that Konoloff could perform light work, regardless of his nebulizer treatments, provided that he avoid concentrated exposure to temperature extremes and pulmonary irritants.

But the ALJ's silence concerning Konoloff's nebulizer use in the RFC leaves the ALJ's

intent unclear. The ALJ could have either intended to reject the frequency of Konoloff's nebulizer use, as the Commissioner urges, or he might have inadvertently overlooked Konoloff's nebulizer use when crafting the RFC and the hypotheticals. *See Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) ("One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant."). The Court should not be forced to speculate as to the ALJ's rationale why he did not include Konoloff's regular use of a nebulizer in the RFC and the hypotheticals. *Williams v. Bowen*, 664 F. Supp. 1200, 1207 (N.D. Ill. 1987) ("No court should be forced to engage in speculation as to the reasons for an ALJ's decision." (citation omitted)). An ALJ must minimally articulate his reasoning so that a court can perform a meaningful review. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." (citation omitted)). If the ALJ intended to reject Konoloff's need for nebulizer treatments three to four times a day, the ALJ was required to explain why, as there is no medical source opinion contradicting Konoloff's need for these treatments. *See Stephens*, 766 F.2d at 287 ("This court insists that the finder of fact explain why he rejects uncontradicted evidence.").

Furthermore, if the ALJ did intentionally reject Konoloff's use of a nebulizer, then the ALJ impermissibly "play[ed] doctor." *See Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1995) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." (citations omitted)); *see Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." (citations omitted)). No medical expert of record opined that Konoloff's

nebulizer treatments were unnecessary; consequently, it is impermissible for the ALJ to indulge in his own lay view of Konoloff's need, or lack thereof, for nebulizer treatments. *See Rohan*, 98 F.3d at 971; *see, e.g, Smith*, 2011 WL 3922465, at *7 (remanding case where the ALJ concluded without the support of a medical source opinion that the claimant did not need to use her nebulizer to manage her breathing conditions); *Begolke*, 2007 WL 5555951, at *10 ("The fact that plaintiff's asthma was ordinarily kept under adequate if not optimal control by medication, as the administrative law judge implied, does not undermine her testimony that she uses the nebulizer often; to the contrary, nebulizer treatments might have actually helped plaintiff avoid a visit to the emergency room or hospital.").

Moreover, there is no indication that the ALJ's failure to address Konoloff's regular nebulizer treatments amounts to mere "harmless error." *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination). The VE testified that most employers would tolerate only two or three unscheduled breaks a week, each of a five- to 15-minute duration. (AR 136). According to this testimony, Konoloff would be unemployable if he required even one unscheduled break per day to perform a nebulizer treatment. *See Klitz*, 180 F. App'x at 810 (remanding case where the ALJ acknowledged the claimant's use of a nebulizer, but he never addressed whether the device was portable, how disruptive it might be to a normal workday, and how it might affect the claimant's ability to work); *Eback v. Chater*, 94 F.3d 410, 411-12 (8th Cir. 1996) (discussing how a claimant's need to use a nebulizer could affect his ability to perform all the duties of a job).

Of course, it is possible that Konoloff's nebulizer treatments could be compatible with

normal work breaks; maybe Konoloff could perform his first nebulizer treatment before he goes to work in the morning, his second treatment during a normal lunch break, and his third and fourth treatments after he returns home from work. But the ALJ never contemplated this in his decision, and what matters are the reasons (or lack thereof) articulated by the ALJ. *See Phillips v. Astrue*, 413 F. App'x 878, 883 (7th Cir. 2010) ("We confine our review to the reasons offered by the ALJ and will not consider post-hoc rationalizations . . . to supplement the ALJ's assessment of the evidence." (citations omitted)); *Holland v. Apfel*, No. 95-CV-7937, 1998 WL 205691, at *12 (E.D. Pa. Apr. 28, 1998) (rejecting the Commissioner's post-hoc argument that the claimant's nebulizer treatments could be reduced from four times a day to three times a day to be compatible with a normal work schedule, where the ALJ never considered this possibility in his decision and there was no support in the medical evidence for the reduction). To reiterate, when assigning an RFC and posing hypotheticals to the vocational expert, an ALJ must include "all limitations supported by medical evidence in the record." *Young*, 362 F.3d at 1003 (citing *Steele*, 290 F.3d at 942). Here, Konoloff's nebulizer treatments three to four times a day are supported by the medical evidence in the record.

In sum, because Konoloff's use of a nebulizer three to four times a day is supported by the medical evidence and testimony of record, and such evidence is uncontradicted, and because the ALJ failed to include this limitation in the RFC and the step-five hypotheticals, the ALJ's decision will be remanded for reconsideration of Konoloff's RFC.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion

and Order.  The Clerk is directed to enter a judgment in favor of Konoloff and against the

Commissioner.

SO ORDERED.

Enter for this 30th day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge